J-S11016-26

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | |
|---|---|
| IN RE: A.M.M., A MINOR | : IN THE SUPERIOR COURT |
| | : OF PENNSYLVANIA |
| | : |
| APPEAL OF: J.M., III, FATHER | : |
| | : |
| | : |
| | : |
| | : |
| | : |
| | : No. 1468 WDA 2025 |

Appeal from the Decree Entered October 21, 2025
In the Court of Common Pleas of Butler County Orphans' Court
at No: 2024-00020A

BEFORE: LAZARUS, P.J., STABILE, J., and NEUMAN, J.

MEMORANDUM BY NEUMAN, J.: **FILED: MAY 11, 2026**

J.M., III ("Father"), appeals from the decree entered on October 21, 2025, in the Court of Common Pleas of Butler County Orphans' Court, which involuntarily terminated his parental rights to his child, A.M.M. (born December 2017) ("Child").[1,2] Father's counsel, Kristin L. Biss, Esquire, has filed a petition to withdraw and a brief pursuant to **Anders v. California**, 386 U.S. 738 (1967), and **Commonwealth v. Santiago**, 978 A.2d 349 (Pa.

---

[1] "Father is the presumptive natural parent of [Child]. Father's name does not appear on … Child's Certificate of Birth. He and [J.M.M. ("Mother")] were not married when [Child] was born, but he represents himself as … Child's father." Orphans' Court Opinion ("OCO"), 10/21/25, at 1.

[2] Mother consented to the termination of her parental rights to Child pursuant to 23 Pa.C.S. § 2504. **See** OCO at 24; **see also** Petition to Confirm Consent to Adoption Decree of Termination – Natural Mother, 10/21/25 (single page).

2009).[3] After careful review, we affirm the decree and grant the petition to withdraw.

**Background**

The orphans' court summarized the relevant facts and procedural background of this case as follows:

The [Butler County Children and Youth Services ("Agency")] initially placed … Child in kinship care in Butler County from February 21, 2019, until June 28, 2019. From September 2021 until October 2023, the Allegheny County Office of Protective Services had an open case with Mother and Father, following their [temporary] move to Allegheny County. On October 31, 2023, the Agency received a General Protective Services ("GPS") [report,] alleging Mother and Father relapsed[] upon using illicit substances. There were also allegations that Father physically assaulted Mother. It was further alleged … Child was present at the time of these instances. On November 1, 2023, caseworker Whitney Hendershot ("Hendershot") contacted Mother and Father to investigate the GPS allegations. Both parents refused drug screening and a home inspection. The Agency received additional GPS reports involving [Child] between November 1, 2023, and November 6, 2023, alleging continued drug abuse by Mother and Father.

On November 3, 2023, Mother tested positive for cocaine…. She admitted using fentanyl and asserted Father was also using it in the presence of … Child. Mother entered treatment at David Archway Drug & Alcohol Rehabilitation. The Agency's intake supervisor, Aaron Williams, attempted to address Father's alleged substance abuse issue, but he refused drug screening and a home inspection, once again. Father consented to temporarily placing … Child with a relative for the weekend. He promised to provide a urine sample the following week. Caseworker Hendershot completed a home inspection and obtained a urine sample from Father, which was ultimately negative, on November 6, 2023.

---

[3] ***See also In re V.E.***, 611 A.2d 1267, 1275 (Pa. Super. 1992) (extending ***Anders*** procedure to appeals from decrees of involuntary termination of parental rights).

[Caseworker] Hendershot visited the home[] again[] on November 17, 2023, but she was refused access into the home … and Father refused a drug screen.

A dependency petition was filed December 5, 2023…. At the adjudication hearing held on January 10, 2024, … the Honorable Maura L. Palumbi[ adjudicated Child dependent based on the recommendation of the juvenile court hearing officer ("JCHO")]. The JCHO noted Father was nodding off during the proceeding, before he became belligerent and refused to answer any questions. Father left the room during the adjudication hearing. A shelter care hearing was scheduled for January 12, 2024.

At the shelter care hearing before the JCHO, neither Mother nor Father appeared, although each parent was represented by court-appointed legal counsel.[4] Judge Palumbi's order dated January 18, 2024, adopted the JCHO's recommendation[,] placing [Child] in kinship care. The Agency was granted legal and physical custody of … Child. Each parent was limited to supervised visitation to be arranged through Totin Family Services ("Totin").

The disposition hearing was held on January 22, 2024. Again, Father and Mother failed to appear, but each parent was represented by their respective court-appointed attorney. The court adopted the recommendations of the JCHO and … Child's Permanency Plan ("CPP") dated January 22, 2024…. Further, … Child remained in kinship placement with [T.C. and L.C. ("Foster Parents")]. The Agency determined … Child required mental health treatment, but could not contact either Mother or Father to make the necessary arrangements. On March 7, 2024, the Agency's Motion to Appoint Temporary Mental Health Decision-Maker was granted by Judge Palumbi, assigning Agency caseworker Rachel Wetick as [Child's] temporary mental health decision-maker.

The initial permanency review hearing … was held on April 3, 2024. While Mother appeared, once again, Father did not attend. The JCHO determined there was minimal compliance by Mother and Father with the CPP. They were not visiting with [Child], refused to undergo regular drug screening, and otherwise were

_____

[4] At the time, Father was represented by "Attorney McCurdy." OCO at 5. By order dated June 12, 2024, the orphans' court granted Attorney McCurdy's request to withdraw, and Attorney Biss was appointed as Father's legal counsel. *Id.*

generally uncooperative with the Agency. Mother and Father were minimally progressing toward alleviating the circumstances which necessitated … Child's original placement. In the intervening time, Mother obtained a protection from abuse [("PFA")] order against Father, who could not be located. The JCHO noted Father regularly violated the final PFA order. He also received new criminal charges. … Legal and physical custody remained with the Agency. [Child] continued placement with [Foster Parents].

OCO at 2-5 (cleaned up).

On April 19, 2024, the Agency filed a petition seeking to involuntarily terminate the parental rights of Father as to Child, pursuant to Sections 2511(a)(1), (2), (5), (8), and (b) of the Adoption Act, 23 Pa.C.S. §§ 2101-2938.[5, 6] Subsequently, the orphans' court approved the Agency's request to schedule a bonding evaluation and parental capacity evaluation concerning Father, as well as a bonding evaluation pertaining to Foster Parents. OCO at 5.

A permanency review hearing was held on July 29, 2024. *Id.* at 6. "In the intervening time, Father became incarcerated in the Butler County Prison." *Id.*[7] "While incarcerated, Father wrote letters to [Child] and participated in

---

[5] The Agency filed a separate petition for involuntary termination of parental rights ("IVT") against Mother on the same date. *See* OCO at 1. As Mother consented to the termination of her parental rights and is not a party to this appeal, we focus on the IVT petition and relevant supporting evidence as to Father.

[6] Judge Palumbi recused herself from presiding over this case, and the matter was reassigned to the Honorable William C. Robinson, Jr. *See* Order, 5/24/24 (single page).

[7] Father testified he was incarcerated from April 17, 2024, until February 21, 2025. N.T., 7/21/25, at 59.

- 4 -

separate parenting and drug and alcohol classes." *Id.* He also received therapeutic visitation with Child once a week for approximately 15 to 30 minutes. *Id.* The JCHO's recommendation noted moderate compliance by Father with the CPP. *Id.* In addition, the Agency moved for a goal change from reunification to adoption. *Id.*

Additional permanency review hearings were held on September 4 and November 27, 2024, during which Father remained incarcerated. *Id.* at 7. At both hearings, the orphans' court adopted the JCHO's recommendations, which noted Father's continued moderate compliance with the CPP. *Id.*; *see also id.* (stating "Father continued moderately complying with the CPP by continuing to write letters to … Child, participating in video therapeutic visits, and engaging in drug and alcohol treatment classes offered by the Butler County Prison").

The orphans' court conducted two full-day hearings, on April 9 and July 21, 2025, to address the Agency's IVT termination petition against Father.[8]

---

[8] Pursuant to 23 Pa.C.S. § 2313(a), a child has a right to counsel in a contested IVT proceeding. Instantly, the orphans' court initially appointed Child's guardian *ad litem* ("GAL"), Kenneth Harris, Esquire, to represent Child's legal interests in the termination proceeding. *See* Order, 5/6/24 (single page). Shortly thereafter, Attorney Harris accepted a position with the Agency and, thus, the court granted him leave to withdraw. *See* OCO at 6. By order dated July 9, 2024, and entered on July 11, 2024, the orphans' court appointed Elizabeth A. Gribik, Esquire, to serve as Child's GAL and legal counsel. *See id.*; Order, 7/11/24 (single page).

"[W]here an orphans' court has appointed a GAL/[c]ounsel to represent both the child's best interests and legal interests, appellate courts should
*(Footnote Continued Next Page)*

*Id.* at 1.  During those hearings, the Agency presented numerous witnesses, including Dr. Eric Bernstein, a licensed psychologist; Marianne Norris, a licensed professional counselor; Kristina Totin, with Totin Family Services; Michelle Matthews, the supervisor of the Foster Care Department at Bethany Christian Services; and several Agency employees.  Father testified on his own behalf and presented his 18-year-old son, J.T.M., as a witness.

**Testimony**

The orphans' court summarized the testimony of the parties' witnesses, in pertinent part, as follows:

*Dr. Bernstein*

Dr. Bernstein, "a duly qualified expert in the child psychology field," performed a virtual parental capacity assessment of Father on September 9,

---

review *sua sponte* whether the orphans' court made a determination that those interests did not conflict." ***In re Adoption of K.M.G.***, 240 A.3d 1218, 1235 (Pa. 2020); ***see also id.*** at 1234 n.20 ("[T]he child's 'legal interests' represented by counsel include the child's preferred outcome, whereas the 'best interests' represented by a GAL reflect what the GAL believes will provide the most beneficial outcome for the child's well-being.").  Accordingly, we observe the orphans' court expressly found no conflict of interest in Attorney Gribik's serving as both Child's GAL and legal counsel in this matter. ***See*** OCO at 1 n.1.  Further, it determined Child, then at the age of 7, was unable to "fully comprehend the true depth of 'permanency' and articulate a reasonable placement preference." ***Id.***  Our Supreme Court has held, "during contested termination-of-parental rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-[GAL] representing the child's best interests can also represent the child's legal interests." ***In re T.S.***, 192 A.3d 1080, 1092 (Pa. 2018).  Moreover, if the preferred outcome of a child is incapable of ascertainment because the child is too young to express a preference, "there can be no conflict between the child's legal interests and his or her best interests...." ***Id.***  As such, we conclude Child was afforded her statutorily-mandated right to counsel.

- 6 -

2024, while he was in prison. *Id.* at 9. He then conducted a bonding assessment of Father and Child on May 14, 2025. *Id.* at 9 n.4. A bonding assessment of Foster Parents and Child was performed separately on July 16, 2024. *Id.* at 9. "According to Dr. Bernstein, a parental capacity assessment determines a parent's fitness to parent a child considering all the circumstances, while a bonding assessment evaluates the impacts, both negative and positive, of terminating parental rights." *Id.*

Regarding Father's parental capacity assessment, Dr. Bernstein indicated:

Father failed to provide any collateral information, so Dr. Bernstein had to rely upon observations of Father and his self-reporting. Father conveyed of once having sole physical custody of [Child] for roughly two (2) months and exercising other "pockets" of time throughout … Child's life. … Father has a favorable opinion of … [Foster Parents], yet believes [they] cross personal boundaries, such as when they read Father's letters to … Child. Father admitted to Dr. Bernstein of a history using various opiates, cocaine, and marijuana. He also acknowledged the [f]inal PFA entered against him involving Mother, but denied ever being physically violent with her. … Father estimated the pending criminal charges filed against him would be resolved in about six (6) months, and then he could assume full parentage of [Child].

On cross-examination…, Dr. Bernstein confirmed Father was cooperative throughout the assessment process. [He] point[ed] out there [were] certain barriers inherent in using a virtual meeting platform to conduct interviews with Father, which slightly inhibited the parental capacity analysis. Father reported there is no relationship between … Child and the half-siblings born to Father.[9] According to Dr. Bernstein, Father also believes [Foster Parents] are overly critical and convey a low opinion of him to … Child, despite Father's otherwise favorable opinion of them. When

_____

[9] Father conveyed he has four children, including Child. N.T., 7/21/25, at 46.

further questioned by Father's attorney, Dr. Bernstein state[d] Father's plan to assume parentage of [Child] would include allowing … Child to maintain a relationship with [Foster Parents], even if he were to eventually gain custody of [her].

*Id.* at 9-10 (some formatting altered).

As to the bonding assessment Dr. Bernstein undertook with Father and Child to determine the appropriateness of reunification, Dr. Bernstein reported:

Significant collateral documents were provided by the Agency…, including, but not limited to[,] Father's certificates of completing substance abuse and parenting classes, criminal docket[] pages pertaining to Father, drug screening and visitation reports, and PFA orders (Mother vs. Father) with indirect criminal contempt information….

[Child] declined a one-on-one interview with Dr. Bernstein, who proceeded to separately interview Father and meet together with … Child and … Father. … Father was "assertive and communicative" during the individual interview. There is no indication Father acted inappropriately during the interactional between Father and … Child. Father admitted [to] a prior drug addiction and recent relapse…, as well as having a criminal record. Recognizing Father loves his daughter and engaged with her during the interactional component of the bonding assessment, Dr. Bernstein concluded in support of adoption, as follows:

To remove [Child] from … Foster Parents' care and elevate Father's role and responsibility to that of a full-time parent would undoubtedly place considerable pressure upon him. How he would manage the pressure of full-time parenting, maintenance of employment, attention to his addictive tendencies, and avoid further legal difficulties is in question and of some concern. Prioritizing [Child's] need for stability[,] remaining in [Foster Parents'] care is ultimately supported even with the understanding that to do so would prevent any further contact between … Child and her biological father. While there is an existing bond, the bond is not necessary for [Child] to thrive. I support the court moving forward with the termination of [Father's] parental rights.

*Id.* at 10-11 (cleaned up).

Dr. Bernstein indicated he supports Foster Parents' intent to adopt Child, should the orphans' court determine termination of Father's and Mother's parental rights is warranted. *Id.* at 10. He noted:

> [Foster Parents] have served as a consistent resource and provider of care to [Child], who has required a couple of removals from her parents' home. They remain committed to and invested in [Child's] life. They show familiarity and knowledge about [Child's] needs. [Child] clearly trusts both [F]oster [P]arents and shares a close bond with them[.]

*Id.*

### *Jasmine Phelps*

Jasmine Phelps, an Agency caseworker, confirmed Child was initially placed outside the home on February 21, 2019. *Id.* at 12. Ms. Phelps stated Father was incarcerated at the time and was scheduled to be released in January 2020. *Id.* She explained Father had some telephone contact with Child while he was in prison, but no face-to-face visitation. *Id.* Ms. Phelps reported the Agency closed the case on November 8, 2019, and Child was returned to Mother, who at some point relocated with Child to Allegheny County. *Id.*

### *Mitchell Amago*

Mitchell Amago, a former caseworker with Allegheny County Children Youth and Families ("CYF"), is familiar with Mother and Father, as he investigated a report Mother was abusing illegal drugs while Father was incarcerated in August 2021. *Id.* He recalled Allegheny County CYF was

granted emergency custody of Child on September 8, 2021. *Id.* Mr. Amago

further testified:

> In February of 2022, Father was released from incarceration and directed to engage in drug and alcohol counseling, drug screening, and mental health treatment. … [A]dditonal concerns arose about domestic violence between Mother and Father, where both were deemed to be aggressors. … Father [was] directed to enroll in batterer's treatment. He failed to do so. … Allegheny County CFY was actively involved with the family throughout the remainder of 2022, until the case closed in October 2023. In the intervening time, Father completed drug and alcohol counseling. He also underwent drug screening through Butler County Adult Probation. On one (1) occasion, Father tested positive for cocaine. [Child] was returned to Mother's care in July 2023…. Father eventually finished his required tasks, which focused primarily on addressing illegal drug abuse. … Father was not seeing Mother and failed to visit [Child] in October 2023.

*Id.* at 12-13 (some formatting altered).

### Aaron Williams

On October 31, 2023, not long after Allegheny County CYF closed its

case involving the family, Agency Supervisor Aaron Williams investigated a

Childline about substance abuse for both parents and domestic violence in the

home. *Id.* at 13. Mr. Williams recalled CYF's attempt to conduct an initial

assessment, stating that although Father initially declined CYF's requests, a

caseworker was ultimately able to complete a drug screen and home

inspection on November 6, 2023. *Id.* He relayed no safety issues were found

regarding Father's home, and the drug screen results were negative. *Id.* He

also conveyed, "Father acknowledged domestic violence, but denied … Child

was exposed to it." *Id.* Mr. Williams clarified there were no allegations of

violence towards Child by Father. *Id.* He further recalled Child's stating she saw Father and Mother put needles in their arms; saw paraphernalia in drawers in the house; and went to "drunk houses" with Mother and Father, "where people would fall asleep standing up." *Id.* at 14. Mr. Williams' involvement in the case ended on February 2, 2024. *Id.*

*Jamie Scherer*

In early 2024, Jamie Scherer, the Agency's family team facilitator, was charged with developing a service plan for the family. *Id.* However, Ms. Scherer said she was unable to meet with Mother and Father to develop an appropriate service plan with a goal toward reunification, because they left the January 12, 2024 shelter care hearing early and did not appear at the January 19, 2024 disposition hearing. *Id.* Her attempts to contact them by mail and telephone were unsuccessful. *Id.*; *see also id.* (reporting a family team meeting never occurred because Mother and Father were uncooperative). Ms. Scherer indicated, as of January 2024, Child had been in placement for 15 out of the prior 22 months. *Id.*

*Rachel Wetick*

Rachel Wetick, the ongoing Agency caseworker, was assigned to this case on February 27, 2024. *Id.* at 14. She reported Child had been placed with Foster Parents "for nearly 1,500 days over varying interrupted periods of time[]," beginning in February 2019. *Id.* Ms. Wetick further indicated Father's location was initially unknown to the Agency. *Id.* at 15. Ms. Wetick

said she sent several letters to Father and made numerous attempts to call and text him between February 27 and April 1, 2024, to no avail. ***Id.***

Further, Ms. Wetick testified:

[Father] was incarcerated in the Butler County Prison on April 17, 2024, where she first met with him on May 9, 2024. Father reported to Ms. Wetick that he planned to initiate contact with [Child], while incarcerated, through letters and virtual visits. Prior to imprisonment, the CPP required Father to maintain sobriety, provide [Child] with proper care, and ensure she [was] in a safe environment. Ms. Wetick further testified to the litany of pending and new criminal charges filed against Father, ranging from simple possession to 15 felony drug trafficking charges, including, but not limited to[,] conspiracy and operating corrupt organizations…. Father was released from incarceration on February 21, 2025, after posting bail.

Under the revised CPP dated March 4, 2025, Father was subject to undergo a mental health assessment, enroll in anger management counseling, and be subject to drug screening[,] initially at Totin … twice a week, later changed to the Glade Run Lutheran Services facility. To date, Father failed to comply with the mental health assessment and treatment for anger issues[.]A final PFA after hearing was entered against him for three (3) years regarding Mother…. He missed four (4) scheduled drug screens in March 2025, and tested positive for THC and Suboxone, when twice appearing for testing. He has a prescription for Suboxone treatment. Father obtained a prescription for THC on March 25, 2025. … The Agency issued Father letters o[f] non-compliance … dated April 3, 4, and 7, 2025, informing him of his non-compliance with the CPP.

Caseworker Wetick further testified Father failed to provide proof of employment, despite his claim he was working at an automobile repair shop, Monday through Friday, from 7 a.m. to 5 p.m. He also told Ms. Wetick he resided with his father, but she had concerns Father was living with other individuals. Father did not attend any of … Child's health care appointments, primarily due to his periods of incarceration. Father refused to sign the Agency's requested authorizations for the release of information, aside from those pertaining to the Agency['s] obtaining certification he completed parenting and substance abuse classes[] while in

- 12 -

prison, and for information from a third-party provider, Crossroads.

Ms. Wetick reported there were no issues [with] … Child's placement in [Foster Parents'] pre-adoptive home. [Child] is involved in family activities. She swims, participates in dance, and [does] cheerleading. The court approved her taking vacations with [Foster Parents], often traveling to visit their family members in Alabama. [] Child has a separate bedroom in the placement home. [Child] does well in school. According to Ms. We[t]ick, … Child shows much affection toward [Foster Parents,] and [she] only observed Father interact with [Child] for approximately ten (10) minutes.

Father takes issue with [Child's] traveling out-of-state with [Foster Parents]. He believes they purposely scheduled these trips to coincide with his scheduled supervised visits with [Child], especially when his mother was visiting from Texas in early March 2025. However, Ms. Wetick said [Foster Parents'] trips were pre-planned and Father failed to give the Agency advance notice of his mother's intent to see [Child]. Ms. Wetick added … Child's GAL objected to contact between … Child and the [p]aternal grandmother because the Agency's [IVT] petition was pending. [Ms. Wetick] noted [Child] visits with her paternal half-siblings, once each month….

In concluding her testimony, Ms. Wetick indicate[d] … Child reports wanting the court process to be over, but not that she doesn't want to ever see her father[] again.

*Id.* at 15-17 (cleaned up).

*Christina Totin*

Christina Totin operates Totin Family Service, a contractual service provider utilized by the Agency in child dependency cases. *Id.* at 17. Ms. Totin recounted:

[She] received the Agency's referral to facilitate visitation between Father and Child on August 9, 2024, when Father was incarcerated in the Butler County Prison. The first virtual visit between them was on August 12, 2024. These visits occurred weekly for one-half hour and contemporaneously included in-

person visitation with Mother. According to Ms. Totin, [Child] was anxious[] prior to the visits with her parents, such as … [Child's] chewing on her shirt, picking and chewing her fingers, or refusing to leave [Foster Parents'] vehicle and participate in some visits. As each session progressed, Ms. Totin observed … Child became less anxious. The virtual visits were consistent[] until October of 2024. For example, Father was late for the October 14 visit and failed to appear on October 21 or November 4, 2024. There were also times when Father did not sign[]on to the virtual platform, later telling Ms. Totin … he confused the dates of the scheduled visits. On one (1) occasion, Father reported to Ms. Totin that he was ill. The virtual visits ended in early January 2025, after Ms. Totin was informed … Mother and Father signed Adoption Consents.

In early February 2025, Father withdrew his consent to adoption within 30 days of executing it and, later that month, was released from the Butler County Prison. The Agency reinstated Father's supervised visitation with [Child], which began in-person with Ms. Totin on March 3, 2025[. Visits] were scheduled to follow every Monday for one (1) hour at the Totin … facility. The initial supervised visit went well and was a positive interaction between Father and [Child]. However, Father did not appear for the scheduled March 17, 2025[] visit, stating he confused the dates. Ms. Totin characterize[d] Father['s] second in-person visit with [Child] on March 31, 2025, as "emotional." To date, Father refused to sign the Totin … Visitation Guidelines … when requested by Ms. Totin. His behavior escalated. Father became irate[] when learning Mother ceased supervised visits with [Child] and declined further visits with … Child. Ms. Totin testified [Child] was crying heavily and stated in Father's presence that she wanted to be adopted. Father did not react to … Child's comment.

Except for this occurrence at the March 31, 2025[] supervised visit, Ms. Totin observed Father generally acted appropriately during the virtual visits he attended from the Butler County Prison. He often spoke to [Child] about the future and the uncertainty surrounding his pending criminal charges, requiring Ms. Totin to re-direct Father and remind him to discuss [Child's] present life. Under cross-examination by Father's attorney, Ms. Totin noted … some of Father's visitation inconsistencies were caused by Butler County Prison['s] altering its inmate virtual visitation system, coupled with Father's lack of flexibility to control his inmate schedule. Ms. Totin further explained the August 26, 2024[]

virtual visit was the only one where … Child displayed resistance to visiting with [Father].

*Id.* at 17-18 (cleaned up; footnote omitted).

*Marianne Norris*

Marianne Norris, a licensed professional counselor employed by Wellness Works, had been meeting with Child once a week since March 2024. *Id.* at 18. Child's treatment goals address "trauma, emotional control, and adaption to the ongoing changes in her family situation." *Id.* at 18-19. Ms. Norris noted progress with Child's ability to express and regulate her emotions and stated:

> [Child's] negative behaviors are often triggered following supervised visits with Mother or Father. [] Child struggles to sleep and will experience nightmares. Ms. Norris continues to work with … Child on dealing with anxiety and fear. According to Ms. Norris, … Child either expresses excitement or indifference[] when meeting with her parents. During the periods of Father's incarceration, [Child] initially showed excitement to receive appropriate drawings and letters from her father. However, as Father's imprisonment continued, … Child became less enthusiastic about receiving his communication.
>
> [] Child relayed … Father is currently nicer to her, in contrast to when she lived with him. [Child] harbors memories of being locked in her bedroom without access to food or the bathroom…. In addition, Ms. Norris was informed by [Child] of previously witnessing drug use multiple times. [She] added, after meeting with the pre-adoptive parents, … Child was more defiant following visitations with her parents. Ms. Norris feels [Child] will continue benefitting from ongoing individual therapy sessions.

*Id.* at 19.

*Michelle Matthews*

Michelle Matthews, the foster care administrator at Bethanny Christian Services, administers Child's placement with Foster Parents. *Id.*[10] She characterized Foster Parents' home as "safe and appropriate" for Child's physical and emotional health, noting Child has a private bedroom and there are no other children living in the house. *Id.* at 19-20. Like Ms. Wetick, Ms. Matthews reported Child expressed "a desire for the court process to end." *Id.* at 20. Ms. Matthews testified Foster Parents and Child "display a strong emotional bond and a very loving relationship." *Id.* She also conveyed Child enjoys visiting with two of her paternal half-siblings; however, Child expressed some fear at seeing or living with Father again. *Id.* Ms. Matthews does not believe Child fully grasps she will no longer have contact with Father if his parental rights are terminated. *Id.*

*Father*

Father indicated he has been living with his father since February 2025. *Id.* He stated his mother, who lives in Texas, has virtual visits with Child; however, there is no evidence to corroborate Father's allegation. *Id.* Father testified:

> [He] completed the Gaiser Substance Abuse class, along with a parenting class, while in the Butler County Prison. He was limited to sending cards and letters to … Child and having video visitations

---

[10] Foster Parents were certified as a pre-adoptive home in May 2025. OCO at 19 n.7.

with her, as arranged. Since being release[d] from prison, Father receives supervised visitation every other week through Totin.

He claim[ed] to operate a contracting business called, "Done Right Home Improvement," established by combining his prior business, "Top Shelf," with his father's home improvement business. He intends to stay in the home improvement contracting line of work. Father is performing drug screens at Glade Run and Crossroads. He has not tested positive, aside from prescription medications.

Father agree[d] there were multiple no-shows for scheduled drug screens in May and June of 2025. He further agree[d Child was adjudicated dependent] on January 10, 2024, and that he was not incarcerated[] until April 17, 2024. He verified release from the Butler County Prison on February 21, 2025[,] and is awaiting prosecution on pending consolidated criminal charges. Father is aware of the many steps needed to manage all the obstacles in his life.

*Id.* at 20-21 (citations to record and footnote omitted).

Following the evidentiary hearings, the orphans' court issued a decree dated October 17, 2025, and entered on October 21, 2025, terminating Father's parental rights to Child, pursuant to 23 Pa.C.S. §§ 2511(a)(1), (2), (5), (8), and (b), as explained in its accompanying opinion. ***See generally*** OCO at 21-35. Father filed a timely notice of appeal on November 13, 2025, along with a concise statement of errors complained of on appeal, pursuant to Pa.R.A.P. 1925(a)(2)(i).

On January 5, 2026, Attorney Biss filed an ***Anders*** brief and petition to withdraw. In the ***Anders*** brief, counsel raises the following issues on behalf of Father:

A. Whether the [orphans'] court committed an error of law and/or abused its discretion by terminating the parental rights of … Father[?]

B. Whether the [orphans'] court committed an error of law and/or abused its discretion in finding that the termination of parental rights of … Father was proper under 23 Pa.C.S. §[§] 2511(a)(1), (a)(2), (a)(5), and (a)(8)[?]

C. Whether the trial court committed an error of law and/or abused its discretion as the court's ruling is not supported by competent evidence o[f r]ecord relative to Father's willingness and ability to remedy the causes and conditions of abuse/neglect in order to provide … Child with essent[ia]l care, control[,] and subsistence[?]

*Anders* Brief at 7.[11]

## Analysis

### *Anders/Santiago*

Before addressing the merits of the issues on appeal, we must first consider counsel's *Anders* brief and petition to withdraw. *See In re Adoption of B.G.S.*, 240 A.3d 658, 661 (Pa. Super. 2020) ("When faced with

---

[11] We note with disapproval that the *Anders* brief does not contain a separate Statement of Questions Involved as required by our Rules of Appellate Procedure. *See* Pa.R.A.P. 2111(a)(4), 2116(a). Thus, we derive these issues from the headings set forth at the start of the Argument section of the *Anders* brief. "Issues not presented in the statement of questions involved are generally deemed waived." *Werner v. Werner*, 149 A.3d 338, 341 (Pa. Super. 2016) (citations omitted). However, we decline to find waiver on the basis of this deficiency, as we are able to discern the issues being raised from the body of the *Anders* brief and, thus, our ability to address the merits of Father's claims is not impeded. *See id.* (stating "such a defect may be overlooked where an appellant's brief suggests the specific issue to be reviewed and [the] appellant's failure does not impede our ability to address the merits of the issue") (cleaned up). Moreover, *Anders* requires this Court to conduct an independent review of the entire record to determine whether the appeal is wholly frivolous. *See Anders*, *supra*; *see also Commonwealth v. Hernandez*, 783 A.2d 784, 787 (Pa. Super. 2001) (overlooking the appellant's failure to file a court-ordered Pa.R.A.P. 1925(a) concise statement because "*Anders* requires that we examine the issues to determine their merit").

- 18 -

a purported **Anders** brief, this Court may not review the merits of the underlying issues without first passing on the request to withdraw.") (cleaned up).

> To withdraw pursuant to **Anders**, counsel must:
>
> 1) petition the court for leave to withdraw stating that after making a conscientious examination of the record and interviewing the [appellant], counsel has determined the appeal would be frivolous;
>
> 2) file a brief referring to anything that might arguably support the appeal, but which does not resemble a "no merit" letter or *amicus curiae* brief; and
>
> 3) furnish a copy of the brief to [the appellant] and advise him [or her] of his [or her] right to retain new counsel, proceed *pro se*[,] or raise any additional points that he [or she] deems worthy of the court's attention.

**In re S.M.B.**, 856 A.2d 1235, 1237 (Pa. Super. 2004) (citations omitted).

> Additionally, our Supreme Court has held an **Anders** brief must:
>
> (1) provide a summary of the procedural history and facts, with citations to the record; (2) refer to anything in the record that counsel believes arguably supports the appeal; (3) set forth counsel's conclusion that the appeal is frivolous; and (4) state counsel's reasons for concluding that the appeal is frivolous. Counsel should articulate the relevant facts of record, controlling case law, and/or statutes on point that have led to the conclusion that the appeal is frivolous.

**Santiago**, 978 A.2d at 361.

"Once counsel has satisfied the above requirements, it is then this Court's duty to conduct its own review of the [trial] court's proceedings and render an independent judgment as to whether the appeal is, in fact, wholly frivolous." **In re X.J.**, 105 A.3d 1, 4 (Pa. Super. 2014) (citation omitted);

- 19 -

*see also Santiago*, 978 A.2d at 356 (determining an appeal is frivolous when it "lacks any basis in law or fact"). Our independent review is not limited to the issues counsel discussed in the *Anders* brief, but extends to "additional, non-frivolous issues" that counsel may have overlooked. *In re J.D.H.*, 171 A.3d 903, 908 (Pa. Super. 2017) (citation omitted).

Instantly, Attorney Biss filed a petition to withdraw on January 5, 2026. We issued a *per curiam* order on January 7, 2026, informing counsel her petition did not comply with the requirements of *Anders*, nor did she attach a copy of the required notice-of-rights letter sent to Father. *See Per Curiam* Order, 1/7/26, at 1. Accordingly, we denied the petition to withdraw without prejudice to refile a new petition to withdraw that complies with all the procedural and substantive requirements of *Anders*, *Santiago*, and their progeny, on or before January 13, 2026. *Id.* at 2. We further directed counsel to serve upon Father a notice-of-rights letter and attach copies of the letter and the *Anders* brief to the petition to withdraw. *Id.*

On January 14, 2026, counsel filed an amended petition to withdraw, attaching a notice-of-rights letter sent to Father. The notice-of-rights letter, however, improperly framed Father's ability to respond as contingent on this Court's granting of counsel's petition to withdraw. *See Commonwealth v. Muzzy*, 141 A.3d 509, 512 (Pa. Super. 2016) (clarifying the notice-of-rights letter shall inform the appellant, upon the filing of the petition to withdraw, he has the immediate right to proceed in the appeal *pro se* or through privately retained counsel). Thus, by *per curiam* order dated January 15, 2026, we

directed counsel to file with this Court a letter addressed to Father advising him of his immediate right to proceed *pro se* or with privately retained counsel, along with proof Father was served with the letter. *Per Curiam* Order, 1/15/26 (single page). Counsel complied, certifying Father was served with a new notice-of-rights letter dated January 16, 2026, which clarified Father's right to proceed in the appeal *pro se* or with privately retained counsel is immediate and not contingent on the Court's granting of counsel's petition to withdraw. **See generally** Response to Order, 1/23/26. Pursuant to **Anders**, the letter further advised Father he has the right "to raise any and all additional arguments on appeal … [he] deem[s] worthy of the Superior Court's consideration…." **Id.** at 2.[12]

Having reviewed Attorney Biss's amended notice-of-rights letter and her amended petition to withdraw, we are satisfied she has substantially complied with the above-stated requirements for withdrawal. **See Commonwealth v. Wrecks**, 934 A.2d 1287, 1290 (Pa. Super. 2007) (observing **Anders** and **Santiago** require substantial, not perfect, compliance). In the **Anders** brief, counsel summarizes the relevant facts and procedural history, albeit void of any citations to the record; she refers to facts in the record she believes could arguably support the appeals; and she concludes Father's appeal is frivolous.[13]

---

[12] To date, Father has not filed a response to counsel's petition to withdraw.

[13] Although we are not pleased with Attorney Biss's failure to cite the record, we reiterate the framework of **Anders** and **Santiago** requires substantial, not

*(Footnote Continued Next Page)*

While Attorney Biss's discussion and application of the relevant law is scant in reaching her conclusion the appeal is frivolous, we deem the applicable law regarding termination to be straightforward in this matter, and Attorney Biss refers to the pertinent provisions of 23 Pa.C.S. § 2511 in her analysis. *See id.* (finding substantial compliance where the relevant law was straightforward even though the *Anders* brief failed to discuss it).[14] As counsel has substantially complied with the technical requirements for withdrawal, we now independently review the record to ascertain if Father's issues are frivolous and to discern whether there are any other, non-frivolous claims he could pursue on appeal.

### Termination of Father's Parental Rights

Father contests the orphans' court's termination of his parental rights to Child. *Anders* Brief at 7. Specifically, he contends the orphans' court erred and/or abused its discretion in concluding the termination of his parental rights was proper under 23 Pa.C.S. §§ 2511(a)(1), (2), (5), and (8). *Id.* He argues

_____

perfect, compliance. *See Wrecks*, *supra*; *Matter of Adoption of N.C.H.*, Nos. 1335 & 1336 WDA 2022, unpublished memorandum at 6-7 (Pa. Super. filed June 23, 2023) (finding substantial compliance with the framework of *Anders* and *Santiago* even though counsel failed to cite to the certified record); *see also* Pa.R.A.P. 126(b) (providing unpublished non-precedential memorandum decisions of the Superior Court filed after May 1, 2019, may be cited for their persuasive value).

[14] *See also In re I.B.*, No. 1407 MDA 2022, unpublished memorandum at 11 (Pa. Super. filed Mar. 3, 2023) ("[T]he *Anders* brief is sparse in its presentation of controlling law and the application of that law. … As we find the applicable law regarding termination to be straightforward and referenced in part by [c]ounsel's discussion, we conclude … her brief substantially complies with *Anders* and *Santiago*.") (cleaned up).

the evidence presented demonstrates a bond between Father and Child. *Id.* at 8-9. Further, Father claims the evidence of record does not support the orphans' court's finding he is unwilling and/or unable to remedy the causes and conditions of the abuse and/or neglect which led to Child's being without essential parental care, control, or subsistence. *Id.* at 7. In support, he points to his testimony regarding his "continued efforts throughout the dependency matter and his incarceration to maintain consistent and appropriate contact with Child[,]" securing employment and a residence, and efforts to remain sober. *Id.* at 9.

Despite Father's claims regarding his more recent remedial efforts and a bond existing between Father and Child, the Agency argues the totality of the evidence supports the orphans' court's finding the statutory elements for termination of Father's parental rights have been met. Agency's Brief at 9-10. It suggests the evidence against Father was "overwhelming[,]" noting Father "never made much, if any, progress toward reunification primarily because he could not maintain his sobriety or regulate his behaviors to avoid incarceration." *Id.* at 10-11; *see also id.* at 11 (noting Father's inability to meaningfully engage with services offered by the Agency to assist him in overcoming his shortcomings and obstacles to reunification). While acknowledging Father has expressed love for Child, the Agency maintains that "after seven (7) years of court involvement, [Father has] yet to demonstrate the ability to provide for Child's needs and well-being." *Id.* at 12. On the other hand, it notes Child has "demonstrated growth and happiness" in her

current placement with Foster Parents and appears bonded with them. *Id.* at 13-14.[15]

When considering an orphans' court's determination of a petition for termination of parental rights, we apply an abuse-of-discretion standard. *In re Adoption of S.P.*, 47 A.3d 817, 826 (Pa. 2012). We must accept the findings of fact and credibility determinations of the orphans' court if they are supported by the record. *Id.* "If the factual findings are supported, appellate courts review to determine if the [orphans'] court made an error of law or abused its discretion." *Id.* (citation omitted). Further, "a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will." *Id.* (citation omitted).

Section 2511 governs the termination of parental rights and requires a bifurcated analysis. *See In re L.M.*, 923 A.2d 505, 511 (Pa. Super. 2007) (citations omitted). We have explained:

> Initially, the focus is on the conduct of the parent. The party seeking termination must prove by clear and convincing evidence that the parent's conduct satisfies the statutory grounds for termination delineated in Section 2511(a). Only if the court determines that the parent's conduct warrants termination of his or her parental rights does the court engage in the second part of the analysis pursuant to Section 2511(b): determination of the needs and welfare of the child under the standard of best interests of the child. One major aspect of the needs and welfare analysis

---

[15] Child's GAL/legal counsel was present at the termination hearings but participated only minimally. She offered no position on the record in favor or against termination of Father's parental rights and has not filed an appellate brief.

concerns the nature and status of the emotional bond between parent and child, with close attention paid to the effect on the child of permanently severing any such bond.

*Id.* (cleaned up). We need only agree with the orphans' court as to any one subsection of Section 2511(a), as well as Section 2511(b), to affirm an order terminating parental rights. *See In re B.L.W.*, 843 A.2d 380, 384 (Pa. Super. 2004) (*en banc*).

*Section 2511(a)(2)*

Here, we consider the involuntary termination of Father's parental rights under Section 2511(a)(2), which provides a basis for termination when:

The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent.

23 Pa.C.S. § 2511(a)(2).

This Court has observed:

To satisfy the requirements of Section 2511(a)(2), the moving party must prove (1) repeated and continued incapacity, abuse, neglect or refusal; (2) that such incapacity, abuse, neglect or refusal caused the child to be without essential parental care, control or subsistence; and (3) that the causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied. The grounds for termination are not limited to affirmative misconduct, but concern parental incapacity that cannot be remedied. Parents are required to make diligent efforts toward the reasonably prompt assumption of full parental duties.

*In re Adoption of A.H.*, 247 A.3d 439, 443 (Pa. Super. 2021) (cleaned up).

Moreover, our Supreme Court has instructed:

[I]ncarceration, while not a litmus test for termination, can be determinative of the question of whether a parent is incapable of providing "essential parental care, control or subsistence" and the

- 25 -

length of the remaining confinement can be considered as highly relevant to whether "the conditions and causes of the incapacity, abuse, neglect or refusal cannot or will not be remedied by the parent," sufficient to provide grounds for termination pursuant to 23 Pa.C.S. § 2511(a)(2).

*S.P.*, 47 A.3d at 830; *see also id.* ("[A] parent who is incapable of performing parental duties is just as parentally unfit as one who refuses to perform the duties.") (citation omitted).

In the case *sub judice*, the orphans' court found "the Agency demonstrated by clear and convincing evidence the parental rights of Father should be terminated under [Section 2511(a)(2)]." OCO at 27. In support, the orphans' court opined:

Since early 2019, … Child was subject to protective services involvement three (3) times: February through June 2019 (Butler County); September 2021 to October 2023 (Allegheny County); and currently from late 2023 to date with the Agency. The primary reason for … the repeated [dependency actions] revolves around illegal drug use by [Child's] parents, which jeopardized her health, safety, and welfare. At the beginning of the current case…, [Father] refused drug screening or failed to appear multiple times[] when scheduled to be tested for illegal substances. He denied the Agency access to the residence for safety inspections. Father's uncooperative conduct with the Agency's protective efforts is well-established by the record. A few weeks prior to the conclusion of testimony in July 2025, Father missed scheduled drug tests. His ongoing refusal to abstain from using illegal substance directly causes … Child to be without essential parental care, control, or subsistence. There is no evidence indicating Father is capable and willing to remedy his behaviors.

Throughout the dependency proceeding, Father wholly disregarded the tasks and requirements under the CPP. He routinely demonstrated minimal progress toward reunification. Father's repeated unwillingness to comply with the CPP is due to his drug[-]fueled lifestyle, criminal behavior, and incarcerations. By his own account, Father exposed … Child to elements of his drug addiction, such as seeing adults dozing off[] while standing.

Father generally shunned rehabilitation efforts and mental health treatment, until he was incarcerated in the Butler County Prison after the Agency[] filed the IVT petition. Father nodded off at the [adjudication] hearing, became belligerent, and left the proceeding before it concluded.

Father is no longer in the Butler County Prison, having been released from incarceration and awaiting prosecution in Butler County on 17 drug-related felony charges. He claims living [*sic*] at his father's home, although it is highly unlikely Father's life is suddenly stabilized. His track record is poor. Unfortunately, the credible evidence points to Father['s] suffering both further drug relapses and involvement in drug related criminal activities. Simply put, he is not positioned to provide essential parental care, control, or subsistence essential for [Child's] physical and emotional well-being. Any minimal parenting progress Father achieves toward reunification is typically followed by subsequent periods of dangerous regressions directly connected to drug use and encounters with law enforcement.

*Id.* at 27-29. The orphans' court's findings are supported by competent evidence of record. As such, we discern no error of law or abuse of discretion in the orphans' court's decision to terminate Father's parental rights pursuant to Section 2511(a)(2).

To the extent Father argues the orphans' court erred in finding he is unwilling or unable to remedy the causes and conditions of abuse and neglect which caused Child to be without parental care, we agree with Attorney Biss that such claim is frivolous. It is clear Father's repeated illegal drug use, criminal activity, and periods of incarceration caused Child to be without essential parental care, control, or subsistence. Yet, as the orphans' court so aptly opined:

The Agency established by clear and convincing evidence Father, throughout the juvenile dependency proceedings, took minimal steps to address his troubling behavioral issues, including, but not

limited to[,] consistently refusing to participate in the many helpful treatment services readily available. Father conveniently missed multiple drug screens, as substantiated by the credible testimony of the assigned third-party provider and the Exhibits duly offered and admitted into the dependency and IVT proceedings. There is little doubt Father cannot maintain ongoing sobriety, except during the multiple stretches of his incarcerations. While obtaining certification he completed drug and alcohol treatment classes when imprisoned is noteworthy, Father slips back into the dark world of illegal drugs and criminal activity upon his release from confinement. … [D]uring the pendency of the Agency's IVT petition, Father was arrested and charged with 17 felony drug charges involving allegations he was involved in a corrupt organization distributing illegal drugs. … Those charges remain pending.

*Id.* at 25-26; *see also id.* at 26 (recognizing Father's compliance with the CPP "slightly improved" after the filing of the Agency's IVT petition, "but not to a satisfactory level"); *id.* (noting any further progress toward achieving reunification was thwarted by the 17 felony drug charges pending against Father). Based on the foregoing, the orphans' court concluded Father "is unable to perform parental duties, refrain from using illegal drugs, and avoid criminal activities." *Id.* at 26. We discern no error or abuse of discretion in the orphans' court's conclusion.

As we have determined the evidence supported the involuntary termination of Father's parental rights under Section 2511(a)(2), we next consider Section 2511(b).[16]

_____

[16] Because *Anders* requires this Court to conduct an independent review of the entire record to determine whether the appeal is wholly frivolous, we overlook Father's failure to specifically challenge the orphans' court's findings regarding Section 2511(b). *See Anders*, *supra*; *In re M.Z.T.M.W.*, 163 A.3d 462, 465 (Pa. Super. 2017) (stating, generally, "this Court will not review
*(Footnote Continued Next Page)*

*Section 2511(b)*

Section 2511(b) provides, in relevant part:

The court in terminating the rights of a parent shall give primary consideration to the developmental, physical and emotional needs and welfare of the child. The rights of a parent shall not be terminated solely on the basis of environmental factors such as inadequate housing, furnishings, income, clothing and medical care if found to be beyond the control of the parent.

23 Pa.C.S. § 2511(b).

With respect to Section 2511(b), our Supreme Court has explained:

[C]ourts should consider the matter from the child's perspective, placing [the child's] developmental, physical, and emotional needs and welfare above concerns for the parent.

Accordingly, the determination of the child's particular developmental, physical, and emotional needs and welfare must be made on a case-by-case basis. We have observed the law regarding termination of parental rights should not be applied mechanically but instead always with an eye to the best interests and the needs and welfare of the particular children involved. Thus, the court must determine each child's specific needs.

Moreover, the child's emotional needs and welfare include intangibles such as love, comfort, security, and stability. As further guidance, we have identified factors, *i.e.*, specific needs and aspects of the child's welfare, that trial courts must always consider. The court must consider whether the children are in a pre-adoptive home and whether they have a bond with their foster parents. And, if the child has any bond with the biological parent, the court must conduct an analysis of that bond, which is not always an easy task.

---

a claim unless it is developed in the argument section of an appellant's brief, and supported by citations to relevant authority"); *see also Commonwealth v. Cox*, 231 A.3d 1011, 1016 (Pa. Super. 2020) ("[T]his Court may overlook certain procedural deficiencies in appellate court filings to ensure that *Anders* counsel has not overlooked non-frivolous issues.").

*Interest of K.T.*, 296 A.3d 1085, 1105-06 (Pa. 2023) (cleaned up).  The trial courts must also "carefully review the individual circumstances for every child to determine … how a parent's incarceration will factor into an assessment of the child's best interest."  *S.P.*, 47 A.3d at 830-31.

Instantly, in support of its conclusion the evidence supported terminating Father's parental rights under Section 2511(b), the orphans' court opined:

> Credible testimony indicates [Child] is well-adjusted in [Foster Parents'] pre-adoptive home[; Child] has been in and out of their care[] since 2019.  … [Child] shows love and affection toward [Foster Parents], who reciprocate.  … Child frequently travels out-of-state with [Foster Parents] to visit [their] family members. [Child] is safe, secure, healthy, and stable in the pre-adoptive home, as confirmed by Dr. Bernstein's testimony regarding the bonding assessment.  She excels in school and is socially active. [Foster Parents] are retired and in good health.  They have ample time each day to provide … Child with positive emotional reinforcement and proper guidance, all in a nurturing environment.  They are well-positioned to properly and effectively parent [Child] through her minority[] and beyond.
>
> Dr. Bernstein believes there is somewhat of an observable bond existing between Father and his daughter, which is no surprise. When Father is free from using illegal drugs, he demonstrates an express desire to parent [Child].  His criminal conduct outside of the parenting role all but voids his attempts to be a responsible and law-abiding father figure to [Child].  However, "the mere existence of a bond or attachment of a child to a parent will not necessarily result in the denial of a termination petition."  *In re T.S.M.*, 71 A.3d 251, 267 (Pa. 2013).  Ongoing stability, continuity, and permanency are critical to the health, safety, and welfare of dependent children and must take priority.
>
> … Child's need for safety, stability, and permanency clearly outweighs any potential harm to … Child caused by severing her emotional bond with Father, who historically demonstrate[d] very little effort to ensure the safety and well-being of his child

throughout most of her young life. ***In re S.B.***, 943 A.2d 983 (Pa. Super. 2008)[,] instructs that, where the inability or unwillingness of a mother or father to remedy drug and alcohol abuse problems [*sic*], it will be in the best interests of their child to have the parental rights terminated, so the child can find safety, permanency, and stability.

The [c]ourt regrettably recognizes … Child may suffer some modest emotional pitfalls with the termination of her father's parental rights, which will also extinguish the very limited relationship that may exist between Father's extended family members and [Child]. There is no reason why [Child] cannot maintain meaningful friendships with Father's two (2) other minor children. However, after providing Father with enumerable opportunities for successful reunification, ultimately the orphans' court must always be especially keen to … Child's best interests by ensuring she has a safe, stable, and permanent home, free from Father's self-destructive lifestyle. The Agency extended Father a reunification plate full of opportunities to avoid involuntary termination of his parental rights to [Child], which he refused to accept by shoving the plate back across the dependency table.

OCO at 33-25.

The evidence of record thoroughly supports the orphans' court's findings, as well as its credibility and weight assessments, regarding Child's needs and welfare and the effect of severing any bond with Father. Thus, we conclude the orphans' court did not abuse its discretion as to Section 2511(b). Any claim to the contrary is frivolous. In addition, our review of the record reveals no other, non-frivolous issues Father could pursue on appeal. Accordingly, we affirm the orphans' court's decree involuntarily terminating Father's parental rights pursuant to 23 Pa.C.S. § 2511(a)(2) and (b), and grant counsel's petition to withdraw.

Decree affirmed. Petition to withdraw granted.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 5/11/2026